Admonitions about the light and staying in the microphone so we can pick you up. All right, Churchwell, Mr. Schaffer. Thank you. May it please the court, I'm Randy Schaffer. I represent Nyle Churchwell who was convicted of two counts of passport fraud, sentenced to 42 months in prison, two and a half times the top of the guideline range. Mr. Churchwell, an adjudication manager at the Houston Passport Office, helped a friend of a friend expedite the process to obtain some passports. He didn't follow the agency policy and procedure in approving the applications, but there's no evidence he knew that the information in the applications were false. Agency rules... Would you preserve your sufficiency objection, Mr. Schaffer, to each counts two and four? There was motion for Rule 29, motion for judgment of acquittal made on these grounds. It was denied. During the trial and then after the trial? Correct. All right, thank you. The agency rules require that an application be accepted even if fraud is suspected, without notifying the applicant to ensure the possibility of prosecution. So even if a passport manager believes an application is fraudulent, they're supposed to pretend nothing's wrong, accept it, and turn it over to fraud. The question is whether the acceptance... Did Churchwell turn over on the incident on count two, did he turn that one over to fraud? No, sir, did not. Count four did. The question is whether the acceptance... Count four he did after another employee told him this is not the way it's supposed to run, and he finally begrudgingly, apparently from the record, said, well, turn this over to fraud, but he had approved it. Well, that was the... He had approved it, hadn't he? He approved it, but he got turned over. Right, after the specialist pointed out to him that this is not right. Correct. So the question is whether the acceptance of an application without following agency policy and procedure makes the employee a party to a false statement made in the application. Now, this is a little outside the realm of our norm, passports. You know, we don't get many cases like that, but let's look at a different type of transaction we're all familiar with, a simple banking transaction. You send your law clerk over to deposit your check in the bank. You want some cash back, and I found out a few weeks ago, after 27 years of doing it, that they're not supposed to give you the money unless you're there present and present photo ID. So the supervisor approves it anyway because she knows me, and I hadn't even hit the elevator bank, and I'm thinking, Nile Churchwell case. So it raises this issue. Let's say I bring a friend down with me to the bank to cash a check, and the friend either presents a fake ID, not his photo, or he doesn't have a photo ID, and he gives a driver's license number. Maybe it's not his number. Or don't even bring the friend. I just show up, and I have a check, and I say, Can you cash this check for my friend? And the supervisor, because she's known me for years, approves the check. Doesn't know there's something wrong with the check, and let's assume the check is either forged, stolen. Surely you understand the gravity of proper procedures with a passport. It's almost insulting, the argument you're making, about trying to compare this to banking transactions. I'm not comparing the nature of the importance of a passport. I'm going to the threshold question of, does a supervisor become a party to a false statement made on a document that the supervisor is not aware of is false just by not following procedure. Obviously, cashing a check is not the same as getting a passport, but the basic principle is the same. So with that in mind, let's turn to the two counts here. Well, in each instance, they asked for him specifically, didn't they? Correct. I mean, he was clearly violating policy and procedure. He was clearly helping a friend get a passport. No question about that. So count two, the false statement alleged in the case is that the child's father was present. You're trying to get a passport to take a three-year-old child to Jamaica to visit her sick mother, and it was a different kid that was there. Obviously, kid didn't have photo ID, but the gravity of the situation is that the representation was the father was present when the father wasn't present. It was all women, and one of the women signed the father's name to the application. So the rules in this situation require both parents to be absent from that parent. So clearly that was not followed here, and Mr. Churchwell admitted during his interview that he approved the application without following procedure, but he said, I didn't know it contained a false statement. I didn't know that kid A wasn't kid B. The government's theory is that by approving the application, he acknowledged that he documented the identification of the parents, which means that both parents were present. Now, I think that's a pretty big stretch, especially when you look at the application and that the false statement alleged in the indictment that dad was present was not made in the application. The fact that mom signed dad's name does not constitute a representation that dad is there. Nobody has cited a case, we haven't found a case, holding that a violation of office policy in approving an application makes the employee a party to inaccurate information contained in the application. Now, Cal 4 is a little bit different. In Cal 4, the applications in Gerald Law's name, the guy presented is Eric Gardner. He doesn't have a photo ID, presents a piece of paper, I guess ostensibly with a driver's license number that Mr. Churchwell writes on the application, writes in an expiration date where that license or the form about the driver's license indicated it had been, it was questionable. I forget what happened to it, but it was cut or something. Well, there was something about it, and it caused the, what was it about it, Paula Moniz, the specialist, to question it, and the guy didn't have the right ID and had a copy of a birth certificate, and she's like, no, and Mr. Churchwell approves, and she's like, no, this is too hinky, you can't approve this, and he says, fine, send it to fraud, and no passport is issued. And again, in his interview, he says, I didn't follow procedure here, but I didn't know that it was a false statement in there. The government's theory is that it was, it's a deliberate ignorance theory, is that he remained deliberate, deliberately ignorant to the fact that Gardner was not law by accepting inadequate identification information, and as the prosecutor said during summation, not asking the right questions. Each count was also aiding and abetting, wasn't it? Correct. Correct. So, but still, it requires a culpable mental state of willful and knowing on his part. So, no one told him that Gardner wasn't law. There's no evidence he knew the driver's license number was incorrect. A conviction on this count requires that he willfully and knowingly make a false statement, and his failure to obtain proper identification does not rise to that culpable mental state. Basically, following, following procedure in accepting the application and sending it to fraud, which caused no passport to be issued, is ultimately what he was required to do. So, even if these guys had walked in and plopped the papers down, and he thought it was no good in the first place, he should have done what he did, which is to accept it and to send it to fraud without alerting them to what's going on. So, when he follows the procedure in that regard, even if he was kind of goaded into doing it, even if he did it, you know, because he thought, well, she knows, he did it. And once he did it, how does he violate the law by doing what the procedure requires him to do? And you can't lose sight of the fact that the jury acquitted him of the distinction between whether he'd entered into an agreement to, you know, get bad passports versus whether he just didn't follow procedure. So, again, I understand there's a big difference between getting a passport and cashing a check, but the ultimate principle is, if the employee, whether it's a passport employee, a bank supervisor, whoever, approves a document that is a favor to a friend, cuts corners, doesn't follow the rules, does that make you a party? Is it a question for the jury to decide based upon his behavior, what he did, his experience at the job, and looking at how he went about doing this to determine if he had knowledge of false statements? Well, obviously, in the first instance, everything is for the jury to decide, but I think it's ultimately a question of law. Let me turn to point three, which has to do with the admission of the assistant director's opinion that he didn't believe Mr. Churchwell's denial that the applications contained a fraud. So this is a sort of a back and forth. The government tries to bring out a redirect that the director had no doubt that Churchwell was involved in fraud, and the objection is sustained. And then on the second cross, the defense lawyer elicits that . . . Why was re-cross and re-redirect allowed? I wasn't there. I don't know. I mean . . . You didn't try this case? No, no. I inherited it. So I take it as you do. I take it as I find it. What do you mean you inherited it? Well, I mean I inherited it from the trial lawyer. I wasn't involved in the trial. But then you were retained to represent him on appeal. Correct. So the defense lawyer elicits on re-cross that Mr. Churchwell admitted he approved the applications and that Mr. Clark, the director, believed that Churchwell was eventually truthful in his statements. That is, that he approved the applications. His initials were on a pretty non-controversial issue. And then on re-redirect or whatever it was, the government elicited over-objection Clark's opinion that he didn't believe Churchwell's denial there was fraud involved. So there's three basic issues we've got to flush through here. First, was the door opened by the cross? Of course, the door is open to the extent the cross-examination permits it. The cross-examination here only established that the . . . Was it the cross or the re-cross? The re-cross. I'm trying to keep some of these re's out. Please keep them in so we know exactly what you're talking about. Okay. The re-cross established only that Mr. Churchwell acknowledged approving the applications and that the witness believed that. That did not open the door to the witness's opinion, ultimate opinion, that Mr. Churchwell was guilty and that he was lying. This is an inadmissible lay opinion that the witness doesn't believe the defendant or believes that the defendant knew that his conduct was illegal. And what I think is telling is that we cited a number of cases. They're from other circuits, but you take them where you find them. And the government made no effort in its brief to acknowledge, much less attempt to distinguish, any of those cases. So I think there's a potential flaw there. And that is that the law is against the government on the admissibility of the testimony. And finally, on the issue of harm, is there a reasonable probability that this opinion contributed to the convictions? You know, I always take with a grain of salt the government's argument on appeal that something wasn't harmful, and I think it's helpful to go back and look at the position the government took at the trial, because that's more telling in terms of what the prosecutor really believed. And at the trial, the prosecutor obviously believed that Mr. Clark's opinion was important because she offered it after the trial court had previously sustained a defense objection to it. So she came back to the well after being told no, gave it a second shot, and was successful this time. So she obviously thought it was important to get that across. And indeed, it was the only evidence to counter Mr. Churchwell's explanation during the interview that although he did not follow policy and procedure, he did not know the documents were fraudulent. And again, if you look at the fact the jury acquitted on conspiracy, convicted on two of the false statement counts, clearly the jury was making a distinction there. The final thing I want to do is the arduous task of convincing this court that the government's argument outside the record that people kill to obtain passports was plain error. And I fall on my sword and concede going in that I know how difficult it is to reverse a case where there's been properly objected to closing argument, much less unobjected to closing argument. But I want to give you four reasons why this court should make a strong statement in this case that that argument was so far out of bounds that you need to call them out on it. First, this was a pretty straightforward fraud trial. I mean, count two, woman's trying to get a passport for her three-year-old kid to go visit the sick mother. It's not a terrorism case. It's not a heinous sort of deal where somebody has a nefarious purpose in getting a passport for a three-year-old kid. The prosecutor, by injecting the specter of murder and terrorism into final argument, is trying to get the jury to convict Mr. Churchwell to protect America from terrorists who obtain passports through fraud. I mean, you can gild this a lily however you want to do it. That's what she was trying to do by making that argument. This was not some slip of the tongue or turn of a phrase. This was something to convince the jury that, hey, you may not think it's a big deal that a guy's trying to get a passport as a favor to a friend for a kid or whatever, but this is the real harm here, and that is that these are being passed out to terrorists that are going to blow the country up. People kill for this sort of thing. No evidence of that wouldn't have been proper if offered part of the argument. Secondly, I believe it demeans the integrity of the system for the government to argue that this was the proper use of hyperbole and extravagant exaggeration, which is the position they asked this court to accept. This is a permissible argument, they tell you. Doesn't matter that there wasn't any evidence of it. This is acceptable for AUSAs to argue in passport fraud trials. The problem is, how's a jury going to know that the prosecutor is just kidding if she was? Aren't they going to take that argument seriously? Wasn't it intended to be taken seriously? And at the end of the day, she wasn't kidding, because if you look at the document she filed of sentencing in requesting an upward variance, which she got big time, in that document she asserts that one of the reasons the judge should go up on the sentence was that Mr. Churchwell's conduct created a threat to national security. So the proof is in the pudding. What she argued to the jury, she meant, because she also argued it to the judge and got a higher sentence. The third reason is, the case against Mr. Churchwell was not strong as the government would have you believe. If it was that strong, why would the jury have acquitted on two or four counts? This was no slam dunk. This was a horse race to the finish line. And more importantly, if the prosecutor at the time of the argument believed the case was that strong, why would she resort to, as they call it, extravagant exaggeration? And invoke the specter of terrorism and murder to get a jury to convict if she thought the jury would convict based on the law and the evidence? You don't make that argument. And the fourth and final reason is we go back to Judge Goldberg, 1979, back in the day, when he wrote in Garza and reversed a conviction for plain error where a prosecutor went outside the record during closing argument and vouched for the credibility of the prosecution witnesses and the strength of the case against the defendant. No objection. And he called them out and wrote a really strong opinion on the duties of an AUSA during closing argument. That was 35 years ago and apparently the message has been forgotten. It has not reached the new generation of prosecutors. This was way out of bounds and you need to throw the flag and call them out. Thank you. Thank you, Mr. Schaffer. All right, we'll hear from the government. Ms. Kalluri, were you trial counsel? No. Excuse me, no, I was not. May it please the court, Anna Kalluri on behalf of the United States. If I'd like, I'd briefly touch on the sufficiency of the evidence. So, count two was the application for, in the name of Mia Venters and it's Exhibit 2-1 and the indictment says that the defendant made a false statement by submitting that MB2, Merlin Venters, the purported father of the minor applicant was present. On Exhibit 2.1, it was the government's Exhibit 2.1 at trial, Mr. Churchwell signed as the acceptance agent and he signed underneath the statement that says subscribed and sworn to in parenthesis affirmed before me. So, when he signed it, he affirmed that the father appeared before him, signed the application and made the oath before him. He obviously didn't do that. There was no mail there. He, Merlin Venters, testified he was not there. Everyone who was there testified that there were only women before him. That right there was sufficient to support Count 2 in the jury's verdict. Going to Count 4, that would be Exhibit 4-1 is the application there. There it is the identification issue. Now, Churchwell tries to classify this as he followed the proper procedure, he needs to accept it, he needs to sign his name and move it along and send it to fraud. Yes, the policy is that you accept what comes to the window, you take it, and if you think there's something fraudulent about it, you send it to fraud. That is the procedure. That is what he was required to do. What he is not required to do is put false statements on the application. Even assuming that a torn piece of paper with a number on it is sufficient to establish ID. He wrote that down as the state ID number. Again, this is Exhibit 4.1. And then he filled in information with no basis for it whatsoever. He filled in the date of birth as 2012, the place of issue Texas. Name, same. There was no name on this paper. There's no date of birth. There's no place of issue. And then he wrote down the ID number and he assumed that it was a state ID number. All of these statements are false. All of these statements were sufficient to support the count for conviction. Now, moving along to Mr. Clark's statement, I think there's a bit of clarification as to how this all happened and going back to Judge Barksdale's question as to why there was recross and redirect. Mr. Clark started testifying about how he was present at Mr. Churchwell's interview with the agents. And then he also had a couple of subsequent interviews with the agents after that. During his testimony, it comes out that after his interview, after he sat in on the interview with Churchwell, he made an email and sent it to his superiors. No one knew about this. The government didn't know about this. Defense Counsel didn't know about this. He hadn't mentioned it at any of the interviews to anyone. So this came out in cross-examination. It was a surprise. No one knew it was there. They went to redirect, and then they stopped for the day. At the end of the day, the judge said, can you find this? We need this. It would be important to have. So they all went home for the day, and then they got it in the morning. So it was just presented to the government and to Defense Counsel at that point, which is why I believe the judge allowed the recross, the redirect, because this was new information that was just presented to the defense counsel. So that's a little bit of context as to how that came out. As they go through it, one of the statements in the interview by Clark was whether or not he thought that Churchwell was eventually telling the truth, and he said yes. And Defense Counsel brought this out numerous times, questioned him repeatedly on this. The it came out on, first it came out on cross, then on redirect. The prosecutor did bring this up, but he did ask Clark if his perception had changed after the interview. The answer should have been a yes or no. It wasn't, did you believe that there was fraud here? It didn't go to the ultimate issue. It should have been a yes or no answer. Clark responded, no doubt in my mind that he had been involved in fraud. It was objected to and sustained. It wasn't responsive to the question. Then on recross, the district court questioned Clark again. I'm sorry. So what was the sharpen for me? His testimony was the predicate for establishing what? The Clark's testimony in general or, he was there to, he was a first witness called and he established the passport. Just the whole procedure? The whole procedure. Everything that happens at the HPA, how when an applicant comes in, what they do, they go to the information desk, they take a little ticket, they go to the counter, the roles of everyone there, who does what, and kind of just set the stage for what occurred. And then it narrows in to the area where you say it should have been a yes or no, right? Yes. So what had happened is when the diplomatic security agents, they wanted to interview Churchwell. Churchwell sent an email to Clark and said, can you come with me on this? I don't know what this is about. Do you know what this is about? Clark said no. And he went and he sent it on the interview with Churchwell. So the first part of his testimony really was about the general policies and procedures and then it narrowed into his observations at the interview. What happened, what was said, various things like that. And really that's how it came up. So it wasn't, the intent was not to No, not at all. He, the direct, it really was recounting with the agent what happened, what was said, what he did, he went to the restroom, he came back, did he appear nervous, did he appear relaxed, various questions like that. Then on cross, they went through the whole thing again and the defense counselors brought out that Clark's first awareness of the accusations against Churchwell and the involvement of him in fraud was at that interview. Before that, he had no idea. This was not something on his radar. He wasn't aware of this. So then on redirect, the prosecutor said, well, after this interview, did your impression change? It should have been a yes or no answer. It wasn't. It was objected to and it was sustained. So on recross, this is now after the email summary of that interview has been presented to both sides. So now on recross, defense counsel gets into it a little bit more and he asked Clark that one of the statements in the email was that Churchwell was, quote, eventually truthful in his statement. And Clark agreed to that. And then he went through and he said that Clark remembered moralizing Churchwell's statement that while he helped them with the applications, he didn't know that they were frauds. So that's where the recross ended. So on redirect, the prosecutor then goes through and says, okay, so you say that in the email, the email summarized in that interview, that Mr. Churchwell denied knowing that there was fraud involved and he says yes. And then you note that you thought that Mr. Churchwell was eventually telling the truth and he says yes. And so then he leads them through and then he asks when Mr. Churchwell was there, said that he did not believe that there was fraud involved or think that fraud was involved in this application, did you believe him? And he said at the end I didn't believe him. And this is after a back and forth about what did you believe, what was your impression? Initially before this interview, did you have any idea that he was involved in this? No. And then how this witness goes through and how his opinions change based on what he sees before him, based on what Churchwell says, Churchwell himself says yes I accepted this information, yes I accepted these applications without adequate support and documentary evidence. So it's a process. The judge at first, yes he objected, he sustained the objection because at that point Defense Counsel hadn't gotten into it and in addition it wasn't responsive to the question. By the time it was eventually allowed in, it had been a back and forth and it had been well covered by Defense Counsel so it was a proper response to that, to get in the entire story and Clark's entire opinion as to what he saw, what he observed. And I think it's important to note that Clark was very clear that his opinions and his observations were based on that interview. He hadn't seen all of these applications up close. He wasn't aware of the evidence presented at trial. He was stating an opinion based on his observations of an interview that he was asked to be there by from Churchwell. Unless there are any further questions. Why don't you just touch on the deliberate ignorance aspect of the government's theory of the case. Obviously counsel opposite is arguing that deliberate ignorance is not at play. It's an innocent set of circumstances maybe an administrative violation but not criminal. The government takes the view he couldn't ignore what he otherwise should know. Well I think the deliberate ignorance instruction was properly given. There was adequate evidence that Churchwell did deliberately ignore what was before him. But even if you push all of that aside this isn't a case where he just ignored things. It didn't question ID that was presented before him. He was given a torn piece of paper with a number written on it and chose and accepted that as proper identification. That's not a driver's license. That's not an ID card. And then he made up information to put on a passport. Putting deliberate ignorance aside which I think was properly given and the jury could have relied on that they didn't have to. It was very clear that he wrote false statements in the application. There's no basis for these statements whatsoever. He made them up out of air. Touching briefly on the closing argument yes the prosecutor did say people kill over that document. Taken in isolation it does sound rather violent. However in context she was talking about the importance of the United States passport. Right before it she says You acknowledge there's a better way to have made that point. Yes it was not artfully phrased. However I don't believe it was air. It was hyperbole. And in context it really does highlight her point. Right before that she says she talks about the United States passport. One of the most valuable documents in the world. A United States passport. People kill over that document. A passport that allows you to open bank accounts abroad, travel within countries. One of the most valuable documents in the world. In context it was clearly talking about the importance of the United States passport. It was not meant to elicit any idea of terrorism. It was not meant to elicit any idea of violence. As my brother notes this was a mundane passport fraud case. There was no issue of violence. There was no issue of terrorism. And yes as sentencing she did ask for a national security departure. And it was warranted to ask for that. It had nothing necessarily to do directly with violence and terrorism but the fact that people who were not supposed to be getting a United States passport were getting United States passports through fraudulent means. So this here in context was a proper use of hyperbole to highlight the importance of the United States passport and that's really what this was about. This was in the passport agency. He was accepting substandard documentation. He was putting false statements on applicants to issue passports to people who did not qualify for them. Even if this court finds that this was an improper statement there was no plain error here. The prejudicial effect if any was minimal. It was a short comment in a 20 minute rebuttal. The evidence against the defendant was strong and not only that but the district court instructed the jury five times that the statements of the parties in argument were just that argument and that they were to decide the evidence for themselves. Unless there are any other questions I'll rest on my brief. Alright. Thank you. We have your argument. Mr. Schaffer you have rebuttal. Three minutes. With regard to count four I think it's important to make the point that there's an assumption here and the assumption is that the information Mr. Churchwell wrote on the form was false information. The record doesn't show that. When Gerald Law testified I don't recall him being asked about you know did your driver's license expire on this date or that date or whatever the specific issues were. In other words the government assumes that because Mr. Churchwell wrote it down he didn't otherwise know it or hadn't been told it by somebody that he just pulled it out of the air. Maybe he did I don't know. The record doesn't show it because the witness wasn't asked. In other words I don't think they proved through Mr. Law that that information was false. With regard to the very briefly the opinion testimony if you think about it what could be more harmful to a person on trial than to have his supervisor come in and say I listened to his interview with the federal agents I've worked with this guy for years I know him. There was no doubt in my mind after listening to the interview he was involved in fraud. I mean really if one of your law clerks was on trial for something and you came in and testified for the government and said I know this law clerk he's worked for me for x number of years and I listened to that interview I'll just tell you I didn't believe his denial that there was fraud involved. Your law clerk is goose is cooked once you come in there. They use the supervisor to basically say this guy's a liar he's not credible and in my opinion he did it and that's just not the way we try people in this country. We don't try based on opinion we try them based on facts. Finally with regard to the closing argument just a couple of comments because you know Was Mr. Reed the lawyer for Churchwell at trial? Yes sir. I believe this is in your record excerpts Mr. Reed says do you recall if at the conclusion of your email that you said you wrote quote my impression close quote uh-huh this is Clark and then the question and one of your impressions was that you believed that Niall was eventually truthful in his statements and the answer yes eventually the question eventually I said that didn't I? Yes. You wanted to say it again? Uh-huh. This seems to be on recrawl bringing up proper redirect examination on the point. Well I think in context he's referring to his statements acknowledging that he approved the applications. I think that's what they have been talking about. On the close argument every trial the court instructs the jury the argument is not evidence you base your verdict on the evidence if that cured the harm of an improper argument you could never reverse a case based on improper argument. This argument was to show the jury this case is not just about a three year old obtaining a passport to go visit her mother this case is much deeper it's much more important it's about people obtaining passports who would kill to get them and if that doesn't raise the specter of terrorism in this day and time what does? And where do you draw the line on what's proper? This is a good one for you all to do it on. Thank you.